IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFERY BROADWAY,

    Plaintiff,                 No. CIV S-06-1482 MCE KJM P

    vs.

T. FELKER, et al.,

    Defendants.            <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action under 42 U.S.C. § 1983, alleging that defendants Dangler, Townsend, Sisto and Barnes failed to protect him from gang retaliation. Defendants Sisto and Barnes have filed a motion for summary judgment; defendants Townsend and Dangler have filed a separate motion for summary judgment. For ease of reference, these will be identified by their respective docket numbers in the body of this document.

I. <u>Summary Judgment Standards Under Rule 56</u>

        Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

/////

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On October 15, 2007, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

/////

/////

## II. Facts

In 2004, plaintiff was convicted of a number of sex offenses involving children and was sentenced to a term of sixteen years in prison. Barnes & Sisto Motion for Summary Judgment (Docket No. 99), Ex. 6. During the times relevant to this action, plaintiff was incarcerated at High Desert State Prison (HDSP). First Amended Complaint (FAC) ¶ 2. In addition, during the times relevant to this action, plaintiff was a member of the Oak Park Bloods. Deposition of Jeffrey Broadway (Broadway Dep.) at 15:21-16:4.

On November 30, 2005, plaintiff covered the window in his cell "because everybody else did it" and he had been told to do so during a meeting of the Bloods. Id. at 23:10-16, 26:17-24. As a result of this incident, plaintiff was given a rules violation report and put in a ninety-day program in a separate Behavior Modification Unit (BMU) in December. Townsend & Dangler Motion For Summary Judgment (Docket No. 67), Ex. 1, Declaration of M. Townsend (Townsend Decl.) ¶ 6; FAC ¶ 17. Inmates in this separate unit did not share yard time with inmates in the general population. Townsend Decl. ¶ 4.

Plaintiff's hearing on the rules violation report was held on December 17, 2005. Broadway Dep. at 23:20-24:2; Docket No. 67-6 at 10 (hearing report). At the hearing, plaintiff said he covered his window because he was told to do so and that those who did not comply would be "disciplined." Broadway Dep. at 25:20-21; Docket No. 67-6 at 10.

Sometime later, a note was pushed under plaintiff's door, saying something like "We know you snitching." Broadway Dep. 48:6-9. Then an inmate nicknamed "Bird" told plaintiff "Bow-Wow [another Blood] said you're snitching, but that ain't my business. I'm going to let them handle it when they get back to the yard." Id. at 29:23-24, 30:6-8. Bird told plaintiff "they read your 115 hearing." Id. at 30:14-15. Plaintiff destroyed the note in accordance with "gang members' protocol." Id. 49:12-18.

A day after this encounter, plaintiff talked to Townsend, who was a counselor for the BMU. Townsend Decl. ¶ 2; Broadway Dep. at 33:23-34:1. Townsend neither confirms nor

denies that this conversation occurred. See Townsend Decl. Plaintiff told Townsend he did not want to go back to the yard because he was told he would be "handled." Broadway Dep. at 34:11-14. Plaintiff said he was afraid of all Bloods because he had been labeled a snitch. Opp'n (Docket No. 79) at 13:12-15[1]; Broadway Dep. at 34:11-19 (he told Townsend he didn't want to go back on the yard because "they were going to try to kill me" and "they" meant "any Blood member), 36:14-15 ("I told him because people were labeling me as a snitch and I have no paperwork to prove that I am not."). When Townsend asked for names, plaintiff gave him the nicknames he had: Bird and Bow-Wow. Broadway Dep. at 35:13-14. He was aware that the inmates' names were posted outside their cells in the BMU, but he was too "scared" to verify Bird's name. Id. at 35:21-36:3. Plaintiff also said he received a note, but had destroyed it. Id. at 53:9-12. Townsend told him "that's not enough." Id. at 35:18.

        According to Townsend, an inmate's report of a threat must be verified; when Townsend is told of a threat, he asks the inmate for a name in order to verify the threat. Townsend Decl. ¶¶ 11-12. If he recognizes the name or nickname, Townsend will attempt to verify the threat by talking to the named inmate; if he does not recognize the name, he asks for more information. Id. ¶ 14. Additional steps to verify a threat might include "following-up on additional information, and evaluating the credibility of the information and the source." Id. ¶ 15.

        Plaintiff submitted a grievance about the alleged leak from his disciplinary hearing. FAC, Ex. D. In this grievance, assigned Log No. 06-303, plaintiff complained he would be "handled" once he returned to general population. Docket. No. 67-6 at 14. The written grievance itself does not identify a source of any threats, but does say that plaintiff's words at the hearing were repeated to "inmates on D-Lower, which is the yard I came from." Id.

/////

---

[1] This is part of plaintiff's statement of disputed facts; it is signed under the penalty of perjury.

5

Because of this grievance, plaintiff was called back to Townsend's office. Broadway Dep. at 37:21-25. Plaintiff told Townsend he filed the grievance because of his concern for his safety, but that he had nothing further to say to Townsend. Broadway Dep. at 38:16-17, 39:12-15.

While he was in Townsend's office, plaintiff talked to defendant Dangler, the Appeals Coordinator, on the phone. Id. at 39:21-22; Docket No. 67-5 at 6-7, Declaration of M. Dangler (Dangler Decl.) ¶ 1. Dangler asked him about grievance 05–3794, which plaintiff submitted after a correctional officer had called him a child molester in the hearing of other inmates. Dangler Decl. ¶ 3; Docket No. 67-6 at 2-8; Broadway Dep. at 40:11-13. Plaintiff told Dangler he wasn't "worried about that 602" and that he wanted to discuss his other grievance, because he had been labeled a snitch and would not feel comfortable on any yard. Id. at 40:13-19, 42:4-6; Dangler Decl. ¶ 7.

According to plaintiff, Dangler said "he didn't care." Broadway Dep. at 40:19. Dangler says plaintiff "refused to or was unable to provide any inmate names or identification to support his safety concerns." Dangler Decl. ¶ 8; Docket No. 79 at 14 ¶ 12. Plaintiff avers that his refusal to provide any names was because "he was scared." Docket No. 79 at 15 ¶ 12 (continued from page 14). Dangler knows of inmates who have falsified safety concerns in an attempt to get a transfer. Dangler Decl. ¶ 9. Accordingly, threats must be verified and once verified, measures will be taken to insure an inmate's safety. Id. ¶¶ 10-11.

Plaintiff pursued grievance 06-303 and received a denial at the second level, which bore the typed name and title "D.K. Sisto, Chief Deputy Warden," but the signature above this line is "R Harris AW." Docket No. 99, Exs. 1 (Declaration of D. Sisto (Sisto Decl.) ¶ 3) & 10; FAC, Ex. F. Defendant Sisto avers he was not involved in grievance 06-303 and was not aware of plaintiff's safety concerns. Sisto Decl. ¶ 4. Plaintiff concedes he never talked to Sisto about his fear for his safety, but contends that Sisto could have had plaintiff placed in protective custody. Broadway Dep. at 55:10-15.

6

| | |
|---|---|
| 1 | In addition, grievance 05-3794 was denied at the second level in a letter |
| 2 | containing the printed name and title "R. Barnes, Chief Deputy Warden," but with the signature |
| 3 | "R. Johnson" and the word "for" above the printed name. Docket No. 99, Exs. 7 & 8; FAC |
| 4 | ¶¶ 21-22 & Exs. A & B. Barnes avers he had no involvement in the disposition of the grievance |
| 5 | and was not aware of plaintiff's safety concerns. Docket No. 99, Ex. 2, Declaration of R.E. |
| 6 | Barnes (Barnes Decl.) ¶¶ 2, 4. |
| 7 | Plaintiff was released from the behavior modification program in March 2006 and |
| 8 | returned to his prior housing area in Lower D Yard. Broadway Dep. at 56:1-4; Docket No. 79 at |
| 9 | 15 ¶ 14. Plaintiff's cellmate told him to watch his back when he went to the yard. Broadway |
| 10 | Dep. at 57:14-15. Plaintiff went to the yard on March 24, 2006, was approached by the shot- |
| 11 | caller for the Bloods and was then attacked. Id. at 58:17-59:1, 60:8-15. |
| 12 | Plaintiff does not believe the assault stemmed from his having been called a child |
| 13 | molester. Broadway Dep. at 80:1-3. |

III. Analysis

In Farmer v. Brennan, 511 U.S. 825, 833 (1994), the Supreme Court confirmed what the Courts of Appeals had "uniformly held": the Eighth Amendment imposes on prison officials a duty "to protect prisoners from violence at the hands of other prisoners." A prison official is not liable, however, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. The Court continued,

> Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm.

Id. at 842-43. In a footnote, the Court added that a prison official "would not escape liability if the evidence showed he merely refused to verify underlying facts that he strongly suspected to be

true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation) . . ." Id. at 843 n.8. The ultimate test is whether the prison official acted reasonably in light of his knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is harmed. Id. at 844.

The Ninth Circuit explored the nature of the duty to protect in Berg v. Kincheloe, 794 F.2d 457 (9th Cir. 1986). Berg claimed he had been placed in protective custody because his life was in danger and that he told Marsh, a prison official, he would be in even greater danger if he went to his job as a tier porter. Marsh ignored Berg's protest and sent him to work, where he was beaten and raped. The Ninth Circuit reversed the district court's grant of summary judgment because the pro se complaint, read liberally, stated a prima facie cause of action. The court observed:

> The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to present such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.

Id. at 459 (internal citation and quotation omitted).

A. Barnes and Sisto

In this case, the undisputed evidence shows that neither Barnes nor Sisto had actual knowledge of plaintiff's concerns and that neither refused to verify suspicions about plaintiff's safety.

Plaintiff argues, however, that the fact that the defendants' names were stamped on the second level disposition establishes their liability because they "had a duty to oversee, inspect, and give authentication to any document with their stamped or written signature." Opp'n To Undisputed Facts (Docket No. 102) at 2:23-26. He cites provisions of the California Code of Regulations that outline the duties of prison officials. Docket No. 102, Exs. B & E. While these regulations may give each defendant responsibility for "the custody, treatment,

training and discipline of all inmates under his or her charge," they do not forbid the delegation of any duties or require exacting review of any delegated task; plaintiff has cited nothing suggesting that such restrictions exist. Id., Ex. B; 15 Cal. Code Regs. § 3380.

Plaintiff is arguing, in essence, that these defendants are liable as a result of their positions as supervisors. However, "liability under section 1983 arises only upon a showing of personal participation by the defendant (citation omitted) . . . [t]here is no respondeat superior liability under section 1983." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); see also Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978) (discussing "requisite causal connection" in section 1983 cases between named defendant and claimed injury); Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."). Plaintiff's attempt to create a factual dispute by relying on laws and regulations about supervisory duties does not preclude summary judgment.

B. Townsend And Dangler

Townsend and Dangler do not directly address the objective part of the Farmer test: whether the conditions of plaintiff's confinement posed a substantial risk of serious harm. Farmer, 511 U.S. at 842. They suggest, but do not explicitly argue, that because plaintiff could have chosen not to go out to the yard when he was returned to D-Facility, plaintiff did not face a substantial risk. Compare Docket No. 67-3 at 4 ¶ 36 (statement of undisputed fact relying on Townsend declaration for proposition that "in general population, going to the yard was optional for inmates") and Docket No 67-2 at 6 (arguing that Townsend and Dangler were not deliberately indifferent because plaintiff did not provide them with sufficient information). The court declines to make defendants' argument for them and finds the question on their motion, whether plaintiff faced a substantial risk of serious harm, to be subject to dispute.

Defendants do argue they were not subjectively indifferent because they would have considered plaintiff's concerns had plaintiff provided the information necessary to verify

the threat. Id. They cite no case law examining an official's obligation, if any, when an inmate will not or cannot name those who had threatened him.

In Davis v. Scott, 94 F.3d 444, 445-46 (8th Cir. 1996), the plaintiff was placed in protective custody because he had enemies in the general population. When those inmates were transferred, Davis attended a classification committee meeting to determine whether he could return to general population. Davis asked to stay in protective custody but was unable to name specific enemies in general population. His claims about the friends of his enemies who remained in general population "were . . . vague and unsubstantiated." Id. at 447. He was removed from protective custody and later assaulted by an inmate.

The Eighth Circuit held:

> [T]here being no solid evidence here of an identifiable serious risk to Davis's safety, the prison officials were not deliberately indifferent in returning him to the general prison population, and they were entitled to summary judgment.

Id. at 447.

However, in Gullatte v. Potts, 654 F.2d 1007 (5th Cir. 1981), an inmate who had provided information to authorities about the gang rape of his cellmate was killed by other inmates even though he had repeatedly asked to remain in the lower security prison camp. The court observed that while the decedent's failure to name those he feared would be admissible and relevant,

> [i]f Nagle [a correctional official] knew or should have known that Gullatte was in danger, it would not seem to be of great import that Gullatte did or did not confirm that fact.

Id. at 1013.

Finally in Longoria v. State of Texas, 473 F.3d 586 (5th Cir. 2006), the inmate plaintiff was an informant, providing information on the Texas Syndicate (TS) to authorities. He filed suit against prison authorities after he was attacked by TS members. The Court of Appeals concluded that many of the correctional personnel named as defendants were not liable

because they were unaware of plaintiff's activities as an informant or that plaintiff had asked to be placed in protective custody. Id. at 594. The court found another defendant not liable because she lacked the authority to transfer the plaintiff and had referred plaintiff's requests to others:

> We have previously held that responding to an inmate's complaints "by referring the matter for further investigation" or taking other appropriate administrative action fulfills an official's protective duties under the Eighth Amendment.

Id.

It is undisputed that plaintiff told Townsend he was afraid to return to the yard because "people were labeling [him] as a snitch and he was, as a result, going to be "handled." Broadway Dep. at 36:14-15. It also is undisputed that when Townsend asked plaintiff for the names of those who had threatened him, plaintiff provided only the nicknames "Bird" and "Bow-Wow." Id. at 35:13-14.[2] It is further undisputed that Townsend took no other steps to verify the information plaintiff provided him: according to plaintiff, Townsend merely said the nicknames and the destroyed note were "not enough." Townsend's own declaration describes only the hypothetical steps he might take to verify an inmate's claim of a threat, but does not address what, if anything, he did in this particular case. Broadway Dep. at 35:18; Townsend Decl. ¶¶ 14-15. Nothing in Townsend's declaration or the other evidence presented in support of his motion for summary judgment shows that he asked plaintiff for a physical description of Bird or checked the files of inmates in the BMU to determine whether nicknames were listed; that he checked plaintiff's central file in an attempt to verify whether plaintiff had indeed "snitched" at his disciplinary hearing; or that he asked anyone involved in the hearing if it were possible that plaintiff's statements had been leaked to gang members. Nothing in the record establishes that Townsend took appropriate administrative action or that he took any action at all in response to

---

[2] Plaintiff testified that Townsend knew who he was talking about because "they know all our nicknames." Broadway Dep. at 36:7-11. The court does not credit this testimony, however, because plaintiff does not suggest his source of knowledge.

11

plaintiff's account. Based on this record, a reasonable finder of fact could conclude that Townsend "refused to verify underlying facts that he strongly suspected to be true or declined to confirm inferences of risk that he strongly suspected to exist . . . ." Farmer, 511 U.S. at 843 n.8.

It is similarly undisputed that plaintiff told Dangler he wanted to talk to him about the grievance describing plaintiff's fear, that upon return to any yard he would be harmed because he was seen as a snitch. Broadway Dep. at 40:13-19; Dangler Decl. ¶ 7. It is further undisputed that plaintiff did not provide any names to Dangler and that Dangler took no further steps. See Dangler Decl. ¶¶ 9-11. There is nothing in Dangler's declaration suggesting he took any other "appropriate administrative action" when plaintiff did not provide the name of the inmate who had threatened him. Moreover, nothing in Dangler's declaration establishes that he lacked the authority or obligation to follow up on threats. Dangler says nothing suggesting he was unaware a "snitch" might face retaliation in the general prison population and does not address whether he attempted to determine whether plaintiff had said something that could be deemed to be "snitching" at the disciplinary hearing. Here also, a trier of fact could find that Dangler declined to verify facts relating to the danger plaintiff could face when discharged from the BMU.

To the extent that the complaint could be read to allege that Dangler is liable because of his refusal to process grievance 06-303 in a certain manner, however, he is entitled to summary judgment. A prisoner has no constitutional right to a prison grievance procedure. Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988). Because inmates do not have a substantive right to prison grievance procedures, the manner in which a grievance is processed does not give rise to a civil rights claim.

C. Qualified Immunity

Townsend and Dangler argue they are entitled to qualified immunity from an award of damages because they could reasonably have believed their actions were lawful. They rely on the facts that there was no immediate threat, inmates sometimes falsify information in

order to secure transfers and they sought additional information in order to verify the threat. Docket No. 67-2 at 8-9.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether a governmental officer is immune from suit based on the doctrine of qualified immunity, the court considers two questions. One is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Saucier v. Katz, 533 U.S. 194, 201 (2001). A negative answer ends the analysis, with qualified immunity protecting defendant from liability. Id. If a constitutional violation occurred, a court must further inquire "whether the right was clearly established." Id. "If the law did not put the [defendant] on notice that [his] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Id. at 202.

Recently, the Supreme Court revisited the manner in which a qualified immunity analysis must proceed. In Pearson v. Callahan, the Court held:

> On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.
>
> Although we now hold that the Saucier protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial.

___ U.S. ___, 129 S. Ct. 808, 818 (2009). Given the particular circumstances of this case, this court sees no reason to depart from the order of analysis presented in Saucier, particularly in light of its conclusion that plaintiff may be able to prove at trial that Townsend and Dangler violated plaintiff's rights.

13

Under Saucier, the reasonableness of a defendant's conduct is judged "against the backdrop of the law at the time of the conduct," which must be undertaken in light of the specific context of the case." Brosseau v. Haugen, 543 U.S. 194, 198 (2004). In Brosseau, the court considered whether an officer who shot a fleeing felon was entitled to qualified immunity; it found he was because the officer's actions fell "in the 'hazy border between excessive and acceptable force.'" Id. at 201 (internal citation omitted).

The Ninth Circuit has examined the contours of qualified immunity in a failure to protect case in Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043 (9th Cir. 2002). In that case, Ford, an effeminate homosexual, was assigned to a cell with inmate Diesso, who was characterized as violent, had stabbed another cellmate and had attacked other inmates and guards. Id. at 1046. Nevertheless, Diesso had successfully been double-celled with a number of inmates including Ford. When both Ford and Diesso independently developed compatibility problems with their current cellmates, they agreed to cell together. Officers who had recently reviewed both files determined that while Diesso was classified as a predator, Ford was not classified as a victim, and the two were not enemies and had no gang-related conflict. Both inmates signed the necessary request to be housed together. Id. at 1047. Just a few days after Ford was transferred to Diesso's cell, Diesso killed him. Id.

The court defined the qualified immunity inquiry in the Eighth Amendment context:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity.

Id. at 1050. It ultimately found that Caden, the correctional officer who continued Diesso's

classification for double-celling, was entitled to qualified immunity despite Diesso's violence because of his recent safe double-celling and the resumption of his medications. Id. at 1051-52.

Arnold, the officer who actually authorized the double-celling talked to another officer who informed him that Ford and Diesso were not enemies. He also knew that Ford and Diesso had previously shared a cell without incident. Although Arnold was aware of some of Diesso's prior history of violence, he did not know its extent. Moreover he did not check the central files of the two, which was a violation of policy; had he checked the files, however, he would not have uncovered evidence suggesting that Diesso was a member of a gang that wanted to attack homosexuals, evidence that was uncovered only after the attack. Id. at 1052. The court thus found a reasonable officer in Arnold's position would not strongly suspect a serious risk.

In contrast, in Velez v. Johnson, 395 F.3d 732 (7th Cir. 2005), the plaintiff, a pretrial detainee, asked for a transfer after his cellmate Zayas began to act "funny," but was left in the cell. One evening, as Zayas held a razor to plaintiff's throat, plaintiff "rather subtly," but unsuccessfully, tried to signal the guards who were making rounds. He thereafter rang the emergency call button, but fearful of getting his throat slashed, told defendant Johnson only that he was not getting along with his cellmate. Johnson asked if Velez had asked for a transfer; Velez said yes, but that there was a conflict. Johnson did nothing further and did not ask any other guards to check on plaintiff. Thereafter Zayas raped plaintiff and cut his neck. Id. at 734-35. Plaintiff filed suit and Johnson filed a motion for summary judgment, claiming he was

/////
/////
/////
/////
/////
/////
/////

entitled to qualified immunity. The district court rejected the claim of qualified immunity and Johnson appealed:

> Johnson argues that he could not have violated Velez's constitutional rights because he had no specific awareness that Zayas had a razor to Velez's throat or that he was planning a rape. We disagree. Johnson did not have to know the specifics of the danger to be culpable. Indeed, accepting Johnson's position would essentially reward guards who put their heads in the sand by making them immune from suit–the less a guard knows the better. That view is inconsistent with Farmer. What matters is that Johnson was aware of a risk of harm in some form, be it assault or the more serious transgression that actually occurred. And just because Velez did not volunteer detailed information does not mean that Johnson was not made aware of a serious risk. Indeed, a jury could well find that the vague nature of Velez's complaint made it even more incumbent on Johnson to investigate further.

Id. at 736.

This case is closer to Velez than it is to Estate of Ford. The facts, taken in the light most favorable to plaintiff, show that plaintiff told Townsend and Dangler he had been labeled a snitch and would be "handled" or harmed when he was released from the BMU to his prior housing unit; plaintiff thus told the defendants he faced a substantial risk of serious harm, albeit in the future. Both defendants asked plaintiff for the names of those who had threatened him, but did nothing further when he was unwilling or unable to provide anything but nicknames. Moreover, in light of the fact that plaintiff felt safe in the BMU, the defendants did not need to act quickly to resolve his security concerns but rather could investigate at a more leisurely pace. Unlike the officers in Ford who made inquiries before placing Ford in the cell with Diesso, these defendants did nothing beyond asking plaintiff for names; like the defendant in Velez, these defendants were aware of a risk of harm, based on plaintiff's report he would be "handled," and yet did nothing to investigate further. And, as with the plaintiff in Velez, nothing in the record suggests this plaintiff had manipulated the system; instead, defendants rely on their more general knowledge and experience that "some inmates" use a claimed threat to secure a transfer. In light of the fact that the duty to protect inmates was clearly established in Farmer, a jury could find

that these defendants did not act reasonably when plaintiff asked for their assistance. Townsend and Dangler are not entitled to qualified immunity.

IT IS HEREBY RECOMMENDED that:

1. The motion for summary judgment filed by defendants Sisto and Barnes (docket no. 99) be granted; and

2. The motion for summary judgment filed by defendants Townsend and Dangler (docket no. 67 ) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 16, 2009.

_____
U.S. MAGISTRATE JUDGE

2 broa1482.57